**FOR PUBLICATION**

# In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-12773

_____

WILLIAM DRUMMOND,
  individually and on behalf of all others similarly situated,
RICHARD ODOM,

*Plaintiffs-Appellants,*

*versus*

SOUTHERN COMPANY SERVICES, INC.,

THE SOUTHERN COMPANY PENSION PLAN,

THE BENEFITS ADMINISTRATION COMMITTEE,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:22-cv-00174-SCJ

_____

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

2                        Opinion of the Court                    24-12773

ROSENBAUM, Circuit Judge:

In 1789, we elected George Washington as the first President of the United States.  But life in this country was far from ideal. Science hadn't yet discovered antibiotics or antiseptics, and the average life expectancy in the United States was about 36 years.[1]  In contrast, today in the United States, the average life expectancy more than doubles that; it's around 76 years for men and 81 years for women.[2]

So imagine if an employer could lower the pension benefits it pays its employees by assuming people's lifespans will be as short as they were back in 1789.  That would be hard to justify.

Plaintiffs Richard Odom and William Drummond allege that their former employer took a similar approach.  In their telling, Southern Company Services, Inc.; its pension plan; and the plan's administrator used unrealistic assumptions about how long they and their spouses would live—as many as 70 years out of date.

Plaintiffs assert that those unreasonable assumptions mean they get less in each monthly pension payment than they're owed.

---

[1] Based on analysis of death records from Massachusetts towns, the Census Bureau reports that life expectancy at birth in 1789 was 34.5 years for males and 36.5 for females.  *See* Bureau of the Census, U.S. Dep't of Com., *Historical Statistics of the United States, 1789 – 1945*, at 45 (1949).

[2] Life expectancy at birth in the United States is 75.8 years for men and 81.1 years for women.  *See* Sherry L. Murphy et al., *Mortality in the United States, 2023*, NCHS Data Brief, No. 521, at 1 (2024), https://www.cdc.gov/nchs/data/databriefs/db521.pdf [https://perma.cc/2LR4-MQNZ].

Had the plan complied with the Employee Retirement Income Security Act of 1974 ("ERISA"), Plaintiffs contend, they would receive thousands of dollars more over time.

Plaintiffs claim that these alleged underpayments violate two parts of ERISA. One provision requires that an annuity that makes monthly payments over the lives of both a married retiree and their spouse must be the "actuarial equivalent" of an annuity that makes higher payments during the life of just the retiree. The other provision prohibits "forfeiture" of an employee's retirement benefit after it has vested.

Defendants Southern Company Services, Inc.; Southern Company Pension Plan; and its Benefits Administration Committee have a vastly different interpretation of ERISA.

In Defendants' view, it's fine to use unreasonable assumptions about life expectancy or annual interest rates. As long as retirement plans write down the assumptions ahead of time, they say, ERISA allows them to use any assumption they please. Indeed, Defendants said at oral argument that ERISA permits them to assume that their employees will live as long as someone would back in 1789.

We don't agree.

ERISA's "actuarial equivalent" requirement and nonforfeiture rule create substantive protections for plan participants and their spouses. So we hold that a plan converting one form of annuity to its "actuarial equivalent" must base that calculation on the kind of actuarial assumptions a reasonable actuary would use. And

4                    Opinion of the Court                    24-12773

an employer cannot charge employees more to be covered by a preretirement death benefit than it costs the employer to offer the benefit. That would violate ERISA's nonforfeiture rule.

Under these interpretations of ERISA, Plaintiffs have plausibly stated claims for relief. So we reverse the district court's dismissal of their complaint and remand for further proceedings.

## I.    BACKGROUND

### A. Annuities, Summarized[3]

This is an ERISA case. ERISA is a landmark statute that Congress enacted to protect American workers' private pensions. Fundamentally, the statute seeks "to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits." *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004) (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)). But ERISA is also famously complex. So fair warning: we're going to need to talk about some technical terms along the way.

This case centers on three types of monthly retirement benefits called "annuities" and the rules ERISA imposes on each. To explain in more concrete terms, we'll consider how each type of annuity would work for a hypothetical couple, Todd and Mary.

---

[3] Because we are reviewing an order deciding a motion to dismiss, we recount the facts as the complaint alleges them.

Imagine that Todd works on the factory line at Acme Industries and is approaching retirement age.  Todd's wife, Mary, is a few years younger and works as a researcher at a biotech startup.

The first type of annuity is the simplest: the **single-life annuity**.  When Todd started at Acme, the company promised him a retirement benefit after he reaches 65 years old.  After Todd retires, Acme's pension plan will pay him a fixed amount each month—let's say 45 percent of his salary—from retirement until death.  We call this type of benefit a single-life annuity because the payments continue throughout the life of one person: Todd.

Pension plans that promise to pay a certain amount each month[4] typically set their standard retirement benefit as a single-life annuity.  *See Esden v. Bank of Bos.*, 229 F.3d 154, 159 (2d Cir. 2000).

ERISA protects the value of retirement benefits an employee has earned, including single-life annuities.  *See Heinz*, 541 U.S. at 744.  One way ERISA does so is through its "anti-cutback rule."

---

[4] Pension plans come in two basic varieties: defined-benefit plans and defined-contribution plans.  *See* 29 U.S.C. § 1002(34)–(35).  Defined-benefit plans guarantee the employee "a fixed payment each month" in retirement, and the employer must make up the difference if the plan's investments underperform.  *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020).  Defined-contribution plans "guarantee only that the employer will contribute to the investment account."  *Hirt v. Equitable Ret. Plan for Emps., Managers & Agents*, 533 F.3d 102, 105 (2d Cir. 2008).  The account's value will vary based on "investment gains and losses."  *Lyons v. Ga.-Pac. Corp. Salaried Emps. Ret. Plan*, 221 F.3d 1235, 1237 (11th Cir. 2000).

That rule means that, once an employee has gained an accrued benefit, his retirement plan can't later decrease that benefit. *See id.*[5] In our hypothetical couple, Todd has an accrued benefit of a single-life annuity that will pay 45 percent of his prior salary. So Acme's retirement plan can't later cut the payments down to only 30 percent of Todd's salary.[6]

But there's still an obvious potential problem when a married couple relies on a single-life annuity. Imagine that Mary's startup doesn't provide any retirement benefits. Mary plans to rely on Todd's pension payments during retirement. But if Todd dies before she does, his single-life annuity payments would stop. Then Mary would receive nothing.

That risk brings us to the second type of annuity: the ***joint-and-survivor annuity***. Most people want to ensure their spouse's financial security. So many participants in retirement plans prefer an annuity that makes sure their spouse isn't left penniless if the participant dies first.

The joint-and-survivor annuity makes that guarantee. As its name implies, this type of annuity has two parts. At the start, there is a fixed payment during the "joint" lives of the participant and

---

[5] "[A]ccrued benefit" is a term of art in ERISA. *See* 29 U.S.C. § 1002(23). Exactly what makes a promised benefit become an "accrued benefit" protected by ERISA's anti-cutback rule isn't relevant here.

[6] The anti-cutback rule has a couple of exceptions, but they're immaterial to our hypothetical couple and to this case. *See Heinz*, 541 U.S. at 744 & n.2.

24-12773                Opinion of the Court                7

their spouse.[7]  Then, if the participant dies first, their surviving spouse continues to receive a "survivor annuity" for as long as he or she lives.  Under this type of annuity, Mary would continue to receive a monthly survivor-annuity payment after Todd dies.

Congress saw joint-and-survivor annuities as important to ensuring surviving spouses' income security.  Ten years after enacting ERISA, Congress amended the statute "to ensure a stream of income to surviving spouses" of pensioned retirees.  *Boggs v. Boggs*, 520 U.S. 833, 843 (1997).  A primary way the Retirement Equity Act of 1984 sought to do so was requiring retirement plans to give married participants their pension benefits as a joint-and-survivor annuity unless both the participant and their spouse opt out.  Pub. L. No. 98-397, § 103, 98 Stat. 1426, 1429–30 (codified at 29 U.S.C. § 1055(a), (c)).

That opt-out process is demanding.  The participant's spouse must give informed consent in writing, witnessed by a plan representative or notary—and the plan must provide a detailed written explanation of the spouse's rights and the ramifications of an opt-out.  *See* 29 U.S.C. § 1055(c)(2)–(3).

The 1984 amendments also imposed rules to ensure that these joint-and-survivor annuities have real value.  They set a floor on the amount of money a surviving spouse will receive after the plan participant dies.  The monthly survivor-annuity payment after

---

[7] Technically, this payment is pegged to the life of the participant and would continue even if the participant's spouse died first.

the participant dies must be between 50 and 100 percent of the monthly payment during the joint lives of the participant and spouse. *Id.* § 1055(d)(1)(A).

Finally, the amendments require the total joint-and-survivor annuity benefit to be the "actuarial equivalent" of a single-life annuity for the participant's life. *Id.* § 1055(d)(1)(B). We later discuss that term a lot—the Act doesn't define it, and the parties' conflicting interpretations form the heart of this case. For now, though, it's enough to say that ERISA requires *some* sort of equivalence between the single-life annuity a participant would otherwise be due and the joint-and-survivor annuity a couple receives. A joint-and-survivor annuity that meets ERISA's requirements is a "qualified" joint-and-survivor annuity. *See id.* § 1055(d).

With a joint-and-survivor annuity, when Todd retires, he will receive a fixed monthly payment during his and Mary's "joint" lives. That monthly payment is almost always lower than the payment in the single-life annuity. After all, payments over two lives are likely to continue for longer than payments during just one of those lives. *Shields v. Reader's Dig. Ass'n, Inc.*, 331 F.3d 536, 539 n.2 (6th Cir. 2003). So each payment in a joint-and-survivor annuity is likely to be lower to adjust for the greater number of expected payments. Let's say that Todd's joint-and-survivor annuity pays 40 percent of his old salary during his and Mary's joint lives.

Then, if Todd dies first, Mary will receive "survivor annuity" payments for the rest of her life. Let's suppose that Mary's monthly survivor benefit is 20 percent of Todd's old salary.

24-12773               Opinion of the Court                    9

To satisfy ERISA, Todd and Mary's joint-and-survivor annuity must be the "actuarial equivalent" of Todd's accrued benefit measured as a single-life annuity. That was a single-life annuity making monthly payments of 45 percent of Todd's salary.

To finish things out, we mention a third type of annuity: the *preretirement survivor annuity*. This benefit is the counterpart to the "survivor" half of a joint-and-survivor annuity. The key difference is when the plan participant dies. A joint-and-survivor annuity pays a beneficiary spouse a survivor annuity if the participant dies *after* the participant retires. A preretirement survivor annuity starts payments to the spouse if the participant dies *before* retiring.

With a preretirement survivor annuity, Mary would get monthly survivor annuity payments if Todd dies while still working. But without such an annuity, if Todd died before retirement, Mary would get nothing.

Starting in 1984, Congress required that retirement plans offer a preretirement survivor annuity to married participants. *See* 29 U.S.C. § 1055(a)(2), (e). Like with joint-and-survivor annuities, this benefit is mandatory unless the participant opts out and their spouse gives informed consent. *Id.* § 1055(c)(1)–(3). And each payment from the preretirement survivor annuity must be at least as much as the survivor annuity payment a beneficiary spouse would receive under a "qualified" joint-and-survivor annuity or the "actuarial equivalent" of that value. *Id.* § 1055(e)(1)(A). An annuity meeting these requirements is a "qualified" preretirement survivor annuity, or "QPSA." *See id.* § 1055(e).

So to meet the statute's QPSA standard, Mary's preretirement survivor annuity payment must be at least 20 percent of Todd's salary, or the actuarial equivalent of that amount.

## B.  *The Southern Company Pension Plan*

Now, we turn to the facts of this case.  Plaintiffs Richard Odom and William Drummond are vested participants in the Southern Company Pension Plan ("Plan"), a defined-benefit pension plan that covers more than 56,000 participants.  The Plan holds about $16 billion in assets.  Southern Company Services, Inc. ("Southern Company"), the Plan's sponsor, is a large gas-and-electric-utility holding company headquartered in Alabama and operating across several states.  The Benefits Administration Committee ("BAC") is the Plan's administrator and named fiduciary.

Under the Plan, participants accrue benefits in the form of a single-life annuity.  A single-life annuity is also the default form of pension payment for unmarried Plan participants.  In contrast, married participants receive a joint-and-survivor annuity unless the participant and their spouse opted out in accordance with ERISA's requirements.

Odom is an Alabama resident who worked as a field technician for Alabama Power until he retired at age 65.  He has received benefits through the Plan since April 2018, in the form of a joint-and-survivor annuity with a 50-percent survivor annuity.  While he was working, Odom and his wife did not waive their right to a preretirement survivor annuity.

Odom complains about two aspects of the Plan's calculation of his retirement benefit. As defined by the Plan, his retirement benefit starts out expressed as a single-life annuity, which he calls his "unreduced" single-life annuity. Odom highlights a first calculation he calls the "QPSA charge." While Odom was working, Southern Company levied an annual 0.75-percent charge against his accrued benefit to account for his preretirement survivor annuity. QPSA charges lowered Odom's final accrued benefit by around 10.5 percent over the course of his career, producing his "reduced" single-life annuity. The Plan's second step that Odom focuses us on converted Odom's "reduced" single-life annuity to a joint-and-survivor annuity using a table of conversion factors, such as 0.9000.[8]

Odom contends that the Plan used unreasonable actuarial assumptions for both calculations. He claims that he would receive more than $15,000 in added payments over the course of his expected lifetime if the Plan had used reasonable actuarial assumptions.

Drummond is a Georgia resident who worked as a financial analyst for Southern Company. He left employment at Southern Company after his accrued benefit vested in the Plan but before he retired from the workforce. When Drummond reached his

---

[8] That conversion factor calculates the monthly joint-and-survivor annuity payment as a proportion of the monthly single-life annuity payment. So for instance, a conversion factor of 0.9000 would convert a single-life annuity paying $2,000 each month into a joint-and-survivor annuity paying $1,800 each month during the joint lives of the participant and their spouse.

retirement age of 65, he chose the "100% JSA" offered by the Plan—a joint-and-survivor annuity that provides survivor annuity payments at 100 percent of the monthly payments during Drummond's life. Like with Odom, Drummond and his wife did not waive their right to a preretirement survivor annuity.

The Plan took similar steps to calculate Drummond's retirement benefit as it did with Odom's. Drummond's benefit, too, started as an "unreduced" single-life annuity. Southern Company then levied an annual 0.875-percent QPSA charge against Drummond's accrued benefit. Those charges made Drummond's "reduced" single-life annuity about 13 percent lower than his "unreduced" benefit. Southern Company based this QPSA charge on mortality assumptions from the 1951 Group Annuity Mortality Table for males ("1951-GAM"), with a "setback" of six years for employees and one year for employees' spouses,[9] and an assumed annual interest rate of 5 percent. Then, the Plan converted Drummond's reduced single-life annuity to a joint-and-survivor annuity, using the same modified mortality estimates from the 1951-GAM and the same assumed interest rate.

Drummond alleges that the Plan imposed excessive QPSA charges. A QPSA charge based on reasonable actuarial assumptions, Drummond contends, would leave him with more than

---

[9] This setback effectively treats each employee as having the life expectancy in the 1951-GAM of a person six years younger than they are. *See Ariz. Governing Comm. v. Norris*, 463 U.S. 1073, 1077 n.2 (1983) (Marshall, J., concurring).

$19,000 in added retirement benefits over the likely remainder of his life.

### C. Procedural History

Drummond filed this lawsuit against Southern Company, BAC, and the Plan in September 2022 on behalf of a putative class. Odom later joined as a named plaintiff. Plaintiffs filed the operative Second Amended Complaint ("Complaint") in September 2023. It asserts four causes of action against Southern Company as the Plan's sponsor and BAC as the Plan's administrator.[10]

Odom brings Counts I and II on his own behalf and on behalf of the putative JSA Class.[11] In Count I, Odom alleges that his joint-and-survivor annuity is less than the "actuarial equivalent" of the single-life annuity he is entitled to, violating 29 U.S.C. § 1055. He asserts that the Plan calculated his joint-and-survivor annuity benefit based on "unreasonable" and "outdated" mortality assumptions that "do[] not reflect current mortality expectations." Odom claims his monthly annuity payment of $2,899.12 is "substantially less" than what he would receive if the Plan complied with 29

---

[10] Plaintiffs named the Plan as a defendant under Rule 19(a) of the Federal Rules of Civil Procedure solely to ensure the availability of complete relief.

[11] The putative JSA Class consists of the following: "All participants of the Plan (and their beneficiaries) who are receiving a joint and survivor annuity (or, for beneficiaries whose spouse died before commencing benefits, a pre-retirement survivor annuity) through the Plan that is less than the value of the single life annuity when converted to a joint and survivor annuity using the interest rates and mortality tables set forth in 26 U.S.C. § 417(e)."

U.S.C. § 1055.  In Count 2, Odom alleges that his joint-and-survivor annuity also violates 29 U.S.C. § 1053(a)'s anti-forfeiture rule.  He contends that the reduction in his monthly benefit is a forfeiture of his vested accrued benefit under the Plan.

Plaintiffs bring Count III individually and on behalf of the putative QPSA Class.[12]  They assert that the Plan imposed excessive annual charges on participants who didn't waive the preretirement survivor annuity.  In Plaintiffs' view, the maximum QPSA charge that ERISA allows is one that reasonably reflects the increased cost of providing the preretirement survivor benefit.  Plaintiffs contend that the Plan "dramatically overestimated" the probability that either of them would die in any given year by relying on "severely outdated" actuarial assumptions.  Based on the overestimate of their likely mortality, Plaintiffs allege their QPSA charges exceeded the amount reasonably necessary to cover the increased cost of providing the preretirement survivor benefit.

Plaintiffs allege that reducing their accrued benefit by the Plan's "excessive" QPSA charges amounts to a forfeiture of their "accrued benefit," which ERISA protects against.

In Count IV, Plaintiffs assert that the same and related conduct breaches BAC's fiduciary duties of loyalty, of prudence, and to disclose accurate information to participants and beneficiaries.

---

[12] The putative QPSA Class consists of "[a]ll participants of the Plan (and their beneficiaries) whose accrued benefit was reduced by a QPSA charge that was greater in magnitude than a QPSA charge calculated using the interest rates and mortality table set forth in 26 U.S.C. § 417(e)."

They bring this count individually and on behalf of both putative classes.

Plaintiffs' Complaint seeks a variety of relief, including declaratory relief, reformation of the Plan to increase joint-and-survivor annuity payments and decrease QPSA charges, disgorgement of profits Defendants gained from violating Sections 1053(a) and 1055, and restitution.

In the district court, Defendants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court granted the motion to dismiss in full. Plaintiffs timely appealed.

Besides the parties, several amici have filed briefs on appeal. The Acting Secretary of Labor submitted an amicus brief supporting Plaintiffs. The Chamber of Commerce of the United States of America submitted an amicus brief supporting Defendants, as did a collection of industry organizations, including the ERISA Industry Committee, the American Benefits Council, and the Committee on Investment of Employee Benefit Assets, Inc.

## II.    STANDARD OF REVIEW

We review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1277 (11th Cir. 2025). We accept the well-pleaded factual allegations in the Complaint as true and construe them in the light most favorable to Plaintiffs. *Julmist v. Prime Ins.*, 92 F.4th 1008, 1016 (11th Cir. 2024). Still, a complaint must allege

"enough facts to state a claim to relief that is plausible on its face." *Watts v. Joggers Run Prop. Owners Ass'n, Inc.*, 133 F.4th 1032, 1039 (11th Cir. 2025) (citation omitted). So its factual content must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. DISCUSSION

We structure our analysis of this appeal in three parts.

First, we must determine whether ERISA's mandate that plans offer joint-and-survivor annuities that are the "actuarial equivalent" of single-life annuities requires the plans to use reasonable actuarial assumptions. We conclude that it does. Under ERISA, plans must offer joint-and-survivor annuities that are actuarially equivalent to single-life annuities using the kind of actuarial assumptions that a reasonable actuary would employ at the time of the benefit determination. Based on that reading, Odom's claim can withstand the motion to dismiss.

Odom's second claim survives for a similar reason. Based on Section 1055(d)'s guidance, Odom's joint-and-survivor annuity is less valuable than his protected "normal retirement benefit" of a single-life annuity. So the Plan's calculation of Odom's joint-and-survivor annuity violates Section 1053(a)'s rule against forfeiture of protected benefits as well.

Finally, Plaintiffs plausibly pled that their QPSA charges violate ERISA's nonforfeiture rule. Congress opened a narrow exception to that rule in 29 U.S.C. § 1055(i), allowing plans to charge

participants for the increased costs of providing a preretirement-survivor-annuity benefit. But Congress instructed us to treat the Secretary of the Treasury's interpretation of this exception as authoritative. The Secretary's reading—and our own—caps these charges at a reasonable reflection of a plan's increased costs from providing the benefit. Plaintiffs allege that their charges were substantially higher than that. So we reverse the district court's dismissal of this claim, too.[13]

## A.  Actuarial Equivalence

Odom alleges that Defendants violated ERISA's actuarial-equivalence requirement by using "outdated and unreasonable mortality assumptions" to convert his single-life annuity into a joint-and-survivor annuity. He contends that, as a result, he will receive a pension benefit worth thousands of dollars less than the benefit he earned.

For their part, Defendants assert ERISA requires only "mathematical equivalency" between the single-life annuity and the joint-and-survivor annuity. In their view, that calculation can use any assumptions whatsoever about mortality or interest rates—no matter how unrealistic, out of date, or unreasonable—so long as they

---

[13] The parties agree that establishing an ERISA violation in one of Plaintiffs' first three claims is sufficient to support their breach-of-fiduciary-duty claim in Count IV. As we explain, both Odom and Drummond have plausibly alleged an underlying ERISA violation. For that reason, we also reverse the district court's dismissal of Count IV.

were written into the plan document. Counsel agreed at oral argument that Section 1055(d) would even allow plans to use mortality data from 1789—when Americans could expect to live less than half as long as they can today.

After a careful analysis of the "actuarial equivalent" provision's text, professional norms in actuarial practice, and ERISA's structure and purpose, we disagree. Section 1055 requires that plans convert married participants' single-life annuities to joint-and-survivor annuities using reasonable mortality and interest-rate assumptions. In reaching this decision, we join the view of the Sixth Circuit, the only other federal court of appeals to have decided the issue. *See Reichert v. Kellogg Co.*, 170 F.4th 473, 483 (6th Cir. 2026).

### 1. Term of Art

This appeal requires us to discern the meaning of a statutory term, so we begin with the text. *See United States v. F.E.B. Corp.*, 52 F.4th 916, 926 (11th Cir. 2022). We note again that the Act requires a "qualified joint and survivor annuity" to be the "actuarial equivalent" of a single-life annuity:

> (1) For purposes of this section, the term "qualified joint and survivor annuity" means an annuity--
>
> > (A) for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity

> which is payable during the joint lives of the
> participant and the spouse, and
>
> (B) which is the actuarial equivalent of a single
> annuity for the life of the participant.
>
> Such term also includes any annuity in a form having
> the effect of an annuity described in the preceding
> sentence.

29 U.S.C. § 1055(d)(1).

Because Congress didn't define "actuarial equivalent" in ERISA, we must turn to other implements from our interpretive toolkit to discern its meaning. As we are construing a term of art, we closely consider publications from the actuarial profession. That literature shows that actuarial equivalence must be based on reasonable actuarial assumptions. Regulatory interpretation of "actuarial equivalent," the plain meaning of its component words, and the canon against insignificance confirm that conclusion.

### a.  "Actuarial equivalent" is a term of art.

We interpret a term of art by looking to the art or science it's drawn from. *See Legal Env't Assistance Found., Inc. v. EPA*, 276 F.3d 1253, 1261 n.6 (11th Cir. 2001). That's because "a cardinal rule of statutory construction [provides] that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) (quoting *FAA v. Cooper*, 566 U.S. 284, 292 (2012)).

20                    Opinion of the Court                 24-12773

By its very language, "actuarial equivalent" is a term of art. *Actuarial* equivalence invokes *actuarial* practice. And the actuarial field is highly technical. It has its own credentialing bodies, educational requirements, and professional norms. *See, e.g.*, Am. Acad. of Actuaries, *Qualification Standards for Actuaries Issuing Statements of Actuarial Opinion in the United States* §§ 1, 2.1 (2021), https://actuary.org/wp-content/uploads/2025/05/USQS_2021.pdf [https://perma.cc/4JJ3-ZN7F].

Indeed, both parties rely on appellate precedent that interprets "actuarial equivalent" as a term of art. *Stephens v. U.S. Airways Group, Inc.*, based its reading on the assumption that "Congress intended that term of art to have its established meaning." 644 F.3d 437, 440 (D.C. Cir. 2011).

To unpack this term, we start with where the parties agree. They both explain that the conversion of a single-life annuity into an actuarially equivalent joint-and-survivor annuity is conceptually a two-step process. The parties agree, as well, that the result of that process is two annuities with an equal present value.[14]

Step one measures the present value of the participant's single-life annuity. *See Call v. Ameritech Mgmt. Pension Plan*, 475 F.3d 816, 817 (7th Cir. 2007) ("To achieve [actuarial] equivalence requires . . . convert[ing] the stream of expected future payments into a present value[.]"). That conversion requires at least two

---

[14] Present value is the value today of a sum of money to be paid at a specified future date. *See* Present Value, *Black's Law Dictionary* (12th ed. 2024).

assumptions.  Because the annuity lasts through the end of a participant's life, mortality assumptions show how many months of payments a participant can expect to receive.  Interest-rate assumptions account for the fact that "a dollar today is worth more than a dollar in the future."[15]  *Gates v. Collier*, 616 F.2d 1268, 1276 (5th Cir. 1980).[16]

Step two then calculates a joint-and-survivor annuity with the same present value that the single-life annuity has.  Because the joint-and-survivor annuity's survivor benefit means that the payments will continue over two lifetimes instead of one, "the payments are likely to continue for a longer period of time."  *Shields*, 331 F.3d at 539 n.2.  So the joint-and-survivor annuity can have lower monthly payments and still be the actuarial equivalent of the single-life annuity.  *See id.*

In practice, plans often use mortality and interest-rate assumptions to develop "conversion factors."  These conversion factors essentially allow a single calculation to complete both steps.  For example, Odom alleges that Defendants used a table of fixed conversion factors such as 0.9000 (for a 50% joint-and-survivor

---

[15] This accounts for the ability to invest the dollar today and start earning interest on it.  Plus, inflation means that a dollar in the future will likely have less buying power than it does now.

[16] The Eleventh Circuit adopted as its own precedent all decisions the Fifth Circuit issued by the close of business on September 30, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

annuity where the participant is three years older than their spouse) and 0.9220 (for a 50% joint-and-survivor annuity where a participant is three years younger than the spouse). Multiplying the monthly single-life-annuity payment by the applicable conversion factor produces the monthly joint-annuity payment—90.0 or 92.2 percent of the single-life-annuity payment, based on these conversion factors. (The survivor-annuity payments are further reduced to, in Odom's instance, 50 percent of that amount.) But this is simply a mathematical shortcut—it doesn't change the nature of the process.

The final key point of agreement between the parties is that the result of conversion must be two annuities with an equal present value. *See* Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Soc'y of Actuaries, *Actuarially Equivalent Benefits* 1, EA1–24–91 (1991), https://www.soa.org/globalassets/assets/files/edu/edu-2009-fall-ea1-02-sn.pdf [https://perma.cc/9HDV-4LG9] ("The fundamental principle underlying the above calculations is the 'equation of value,' . . . [which] means that the actuarial present values of the pensions on each basis are equal.").

This area of agreement is essentially the judicial definition from *Stephens* that Defendants invoke repeatedly: "Two modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." *Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield, *supra*, at 1). That definition was sufficient for the question facing the *Stephens* court,

where the assumptions used to calculate actuarial equivalence were not at issue. *See id.* ("[T]here is no dispute U.S. Airways accurately calculated Plaintiffs' lump sums to be the 'actuarial equivalent' of the annuity option as of the annuity start date[.]"). But that definition does not answer the question before us.

### b.  Actuarial norms require reasonable assumptions.

Now we get to the part where the parties diverge. They disagree about the types of mortality and interest-rate assumptions that a plan can use to calculate actuarially equivalent annuities.

Odom argues that a requirement to use "reasonable" or "current" actuarial assumptions is "baked into the concept of an *actuarial* equivalent." In contrast, Defendants' "mathematical equivalency" understanding of actuarial equivalence imposes no substantive conditions on the assumptions a plan uses. In Defendants' view, the plan must merely use the same set of assumptions when converting the single-life annuity to a present value and when converting that present value to a joint-and-survivor annuity.

The difference between the parties' positions is significant. The mortality and interest-rate assumptions a plan chooses "play a key role in determining the magnitude of the actuarial equivalence factor." Schwartzmann & Garfield, *supra*, at 11. Depending on those assumptions, a participant's monthly joint-annuity payments under a joint-and-survivor annuity might be 90 percent, 95 percent, 80 percent, or even 20 percent of what that participant would receive in a single-life annuity. And of course, calculating a lower

percentage doesn't change how long a participant or their spouse can actually expect to live. It just means that they'll receive less money over that time.

We agree with Odom's reading. ERISA's definition of "present value," our past engagement with the same concept, and professional norms in the actuarial industry point in the same direction. Each source shows that actuarial equivalence connotes a degree of connection to empirical grounding and realistic expectations about the future. For this reason, the meaning of "actuarial equivalent" can't support Defendants' proffered "anything goes (as long as you wrote it down)" interpretation of Section 1055(d).

First, ERISA defines "present value" for all of Title I of ERISA, which includes Section 1055. Under that definition, "[t]he term 'present value', with respect to a liability, means the value adjusted to reflect anticipated events." 29 U.S.C. § 1002(27).

Reflecting "anticipated" events strikes us as meaningful. Defendants don't explain how projections based on mortality data from many decades ago—much less from 1789—reflect "anticipated" lifespans for workers and retirees today. True, ERISA did not expressly incorporate the definition of "present value" into "actuarial equivalent." But calculating present values is an inherent part of establishing actuarial equivalence. The meaning of "present value" shows that Congress understood actuarial calculations to have a connection to real-world data and realistic premises.

When assessing the value of future annuity payments, we have previously reached a similar conclusion. We've said that

extrinsic evidence can help reveal the "true" present value of a set of future payments. *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 840 (11th Cir. 2006).

Second, actuarial guidelines show that the profession has a norm of using reasonable, realistic assumptions. And examining "technical literature" from those proficient in a field is a useful way to shed light on the meaning of a term of art. *See Utah v. Evans*, 536 U.S. 452, 467 (2002).

Odom points us to two Actuarial Standards of Practice ("ASOPs") from the Actuarial Standards Board.[17] All five major U.S.-based actuarial organizations require their members "to satisfy applicable ASOPs when rendering actuarial services in the United States." Actuarial Standards Bd., *Actuarial Standard of Practice No. 1: Introductory Actuarial Standard of Practice* § 1 (2013), https://www.actuarialstandardsboard.org/asops/introductoryactuarialstandardpractice/ [https://perma.cc/34SV-DQYA] ("*ASOP No. 1*"). These ASOPs are also "binding" on actuaries. *See id.* § 4.1. Indeed, failing to follow an applicable ASOP triggers professional discipline. *See id.* We view these documents as a reliable guide to

---

[17] The Actuarial Standards Board describes itself as "set[ting] standards for appropriate actuarial practice in the United States through the development and promulgation of Actuarial Standards of Practice (ASOPs). These ASOPs describe the procedures an actuary should follow when performing actuarial services and identify what the actuary should disclose when communicating the results of those services." *About ASB*, Actuarial Standards Bd., https://www.actuarialstandardsboard.org/about-asb/ [https://perma.cc/A3FU-AJK9] (last visited Apr. 24, 2026).

actuarial norms.  *See M & K Emp. Sols., LLC v. Trs. of the IAM Nat'l Pension Fund*, No. 23-1209, 608 U.S. ___, slip op. at 8 n.3 (May 21, 2026) ("Consulting the Actuarial Standards of Practice is appropriate here because this is a statute 'addressed to specialists,' so it 'must be read by judges with the minds of the specialists.'" (quoting *Becerra v. Empire Health Found.*, 597 U.S. 424, 434 (2022)).

Consider ASOP No. 1, *Introductory Actuarial Standard of Practice*.  It discusses the "many instances" in which ASOPs "call for the actuary to take 'reasonable' steps, make 'reasonable' inquiries, select 'reasonable' assumptions or methods, or otherwise exercise professional judgment to produce a 'reasonable' result when rendering actuarial services."  *Id.* § 2.10.

ASOP No. 27 further drives home the priority on using realistic mortality and interest-rate assumptions.[18]  It calls on actuaries to "use professional judgment to select *reasonable* assumptions" when measuring the actuarial present value of pension-plan liabilities such as the annuities a plan owes participants.  Actuarial Standards Bd., *Actuarial Standard of Practice (ASOP) No. 27: Selection of*

---

[18] In his briefing, Odom directs us to ASOP No. 35, *Selection of Demographic and Other Noneconomic Assumptions for Measuring Pension Obligations*.  But the Actuarial Standards Board repealed ASOP No. 35 in June 2024 after revising ASOP No. 27 to cover the same material.  *See* Actuarial Standards Bd., *Repeal of Actuarial Standard of Practice No. 35: Selection of Demographic and Other Noneconomic Assumptions for Measuring Pension Obligations* (2024), https://www.actuarialstandardsboard.org/asops/asop-no-35-documentation-and-disclosure-in-property-and-casualty-insurance-ratemaking-loss-reserving-and-valuations-repealed/ [https://perma.cc/77G4-ZUK5].

*Assumptions for Measuring Pension Obligations* § 3.5 (2023) (emphasis added),          https://www.actuarialstandardsboard.org/asops/ adopted-asop-no-27-selection-of-assumptions-for-measuring-pension-obligations/ [https://perma.cc/34LR-4XL7] (*"ASOP No. 27"*)[19]

That ASOP also establishes a presumption about the mortality data actuaries use.  It generally directs actuaries to use actual-participant mortality data or "recently published relevant and generally available mortality tables" rather than "mortality tables that substantially predate" newer data.  *Id.* § 3.12.  If an actuary wishes to use older mortality tables, the actuary must "disclose the information and analysis used to support the actuary's determination that the assumption is *reasonable*."  *Id.* § 4.1.2 (emphasis added) (as cross-referenced by *id.* § 3.12).

Not only that, but actuarial standards of practice show a norm of verifying the reasonableness of previously selected assumptions.  Actuarial standards require actuaries to "determine whether the assumptions selected by the actuary for a previous measurement date continue to be reasonable" and, if not, to "select a reasonable new assumption."  *Id.* § 3.19.  Notably, the source

---

[19] Although this ASOP deals with calculating the value of a plan's liabilities, it notes that its scope does not "generally include individual benefit calculations [or] individual benefit statement estimates."  *ASOP No. 27* § 1.2.  That caveat doesn't diminish the ASOP's ability to help answer the broader question at issue here: whether professional norms require the use of realistic assumptions when developing projections about the future.  After all, the ASOP expressly includes "converting from one annuity form to a different annuity form" as one practice it addresses.  *Id.* § 3.17.5.

underlying Defendants' preferred definition of "actuarial equivalent," from *Stephens*, shows the same principle.  Schwartzmann & Garfield, *supra*, at 11 ("Periodically, the [interest and mortality] assumptions used must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment.").

And these norms were established well before Congress enacted the "actuarial equivalent" requirement in 1974.  In supplemental briefing, Odom points us to the 1964 edition of *Fundamentals of Private Pensions*, a textbook that the U.S. Supreme Court has cited when dealing with retirement pensions.  *See, e.g.*, *Ala. Power Co. v. Davis*, 431 U.S. 581, 594 (1977).  It states that, when assessing the value of pension liabilities such as annuities, "[i]f the actuary performing the valuation is competent and true to the ideals of his profession, he will base his forecasts on assumptions which at the time of the valuation *seem to be the most appropriate for the case at hand*."  *See* Dan M. McGill, *Fundamentals of Private Pensions* 218–19 (2d ed. 1964) (emphasis added).  And if the "actual experience" under the plan deviates significantly from earlier assumptions, "it is incumbent upon the actuary to modify his assumptions to an appropriate degree upon subsequent valuations."  *Id.* at 219.

Many other sources show that actuarial science has called for the use of "appropriate" or "suitable" mortality tables that "align[] with the life expectancy of the relevant participant population" dating back to long before 1974.  *Reichert*, 170 F.4th at 481 (collecting sources).

On the whole, the professional literature displays the expectation that actuaries employ reasonable mortality and interest-rate assumptions. That is, they should use assumptions that provide a realistic basis for projecting future events.[20]

Our sister court of appeals has relied on a similar view that tethers actuarial equivalence to realistic mortality assumptions. The Ninth Circuit determined whether two values were "actuarial equivalent[s]" under another section of ERISA in *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1120 (9th Cir. 2000). The court inquired whether the plan used "actuarially correct" mortality assumptions rather than "understated" mortality assumptions that "treat[] a person either as surviving longer than would actuarially be expected or as retiring earlier than is chronologically true." *Id.*

To better estimate "the true mortality assumption for each plan participant," the court held that a pension plan could adjust mortality tables to reflect the gender ratio of its participants. *Id.*

That said, we note that "reasonableness is a zone, not a point." *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 706 (4th Cir. 2018) (brackets omitted) (quoting *Artistic Carton Co. v. Paper Indus. Union–Mgmt. Pension Fund*, 971 F.2d 1346, 1351 (7th Cir. 1992)). The technical literature

---

[20] The U.S. Supreme Court recently expressed a consonant understanding of actuarial assumptions based on its review of the Actuarial Standards of Practice. The Court stressed that actuarial assumptions are "predictive judgments" about the future, not arbitrary "factual inputs" that must be frozen in time. *M & K Emp. Sols.*, No. 23-1209, slip op. at 7–8.

30                       Opinion of the Court                 24-12773

we've discussed embraces that principle. "Because actuarial prac-
tice commonly involves the estimation of uncertain events, there
will often be a range of reasonable methods and assumptions, and
two actuaries could . . . us[e] reasonable methods and assumptions,
and reach different but reasonable results." *ASOP No. 1* § 2.10.

    c.  <u>Defendants do not provide contrary professional literature.</u>

      Defendants provide nearly no relevant professional litera-
ture supporting their reading. Their appellate brief attempts to re-
but Odom's citations to technical literature almost exclusively with
the summary-judgment opinion in *Belknap v. Partners Healthcare
System, Inc.*, 588 F. Supp. 3d 161 (D. Mass. 2022).

      But the *Belknap* summary judgment opinion doesn't help
Defendants. It expressly relied on expert reports and expert testi-
mony from a record that isn't before our Court. *See id.* at 174 &
n.7. We can't rely on that court's record. If nothing else, a different
district court reviewing different expert testimony "readily distin-
guished" *Belknap*. *Scott v. AT&T Inc.*, 790 F. Supp. 3d 781, 790 (N.D.
Cal. 2025).[21]

---

[21] Earlier proceedings in *Belknap* itself underscore the point. When it decided
a motion to dismiss, as we do here, the *Belknap* court rejected Defendants'
position. *See Belknap v. Partners Healthcare Sys., Inc.*, No. CV 19-11437-FDS,
2020 WL 4506162, at *2 (D. Mass. Aug. 5, 2020) ("Surely, Congress intended
the 'actuarial equivalence' requirement . . . to provide some degree of protec-
tion to beneficiaries, and not to permit employers to use any assumptions they
chose, no matter how outmoded or inapt.").

After we requested supplemental briefing, Defendants provided a few historical publications.  But those documents simply restate the same principle we covered previously.  For instance, Defendants cite the Society of Actuaries *Report on Actuarial Terminology for Pension Plans* for the proposition that "[a]ctuarial equivalence [means] [t]he situation where two or more items have an equal actuarial present value under a selected set of actuarial assumptions."  Comm. on Pensions, Soc'y of Actuaries, *Report on Actuarial Terminology for Pension Plans*, 28 Transactions Soc'y Actuaries 327, 329 (1976) (italics omitted).  No one debates that.  But these materials don't show what Defendants need—that two annuities are actuarially equivalent even if they can be equated only by using patently outdated, unrealistic, or even totally arbitrary assumptions.

The closest Defendants get is an appendix to a 1978 law-review article about dividing retirement benefits in a divorce.  Henry Alan Pattiz, *In a Divorce or Dissolution Who Gets the Pension Rights: Domestic Relations Law and Retirement Plans*, 5 Pepp. L. Rev. 191, 278 (1978).  But that source is not clear or authoritative enough to unsettle our conclusion.  Defendants find no more support in their misplaced citations to several pre-ERISA state laws that discuss the assumptions that publicly constituted bodies adopt for *public* pensions.

So Defendants attempt to undermine Odom's authorities.  They focus on the fact that many of Odom's professional publications discuss the initial selection of actuarial assumptions.  In

Defendants' telling, those sources have no bearing on a later calculation of retirement benefits using assumptions that have "already been selected and memorialized in the plan."

We are not persuaded for two reasons.

First, the statute provides no basis for slicing the salami so finely. Section 1055 requires plans to provide each married participant with a joint-and-survivor annuity that "is the actuarial equivalent of a single annuity for the life of the participant." *See* 29 U.S.C. § 1055(a)(1), (d)(1)(B). The statute speaks in the present tense. Its text shows a concern with whether two annuities are equivalent in value now, not whether they would have been for a different participant decades earlier.

Second, the professional literature we've reviewed shows many circumstances where actuaries must ensure that previously selected assumptions remain reasonable. Perhaps a more developed record will show that the Plan's actuarial assumptions fall within the range of reasonable actuarial practice. But we need not articulate the exact parameters of the reasonableness norm in actuarial practice, especially without the benefit of expert testimony. It is enough to conclude that actuarial equivalence requires the use of reasonable, realistic mortality and interest-rate assumptions.

   d. Regulatory interpretation, plain meaning, and semantic canons support our understanding of actuarial equivalence.

Our conclusion finds further support in a longstanding regulatory interpretation, the plain meaning of the terms in the phrase, and our traditional semantic canons.

First, the regulation.  Since shortly after Congress passed ERISA, the Secretary of the Treasury has interpreted the statute's provision mandating "actuarial equivalent" joint-and-survivor annuities to require conversion from the plan's "normal form of life annuity" using "consistently applied reasonable actuarial factors." 26 C.F.R. § 1.401(a)-11(b)(2).[22]

We find the tax regulation informative.  It interprets statutory language that, although codified in the Internal Revenue Code, is identical to the text we are considering.  Both provisions require joint-and-survivor annuities to be "the actuarial equivalent of a single annuity for the life of the participant."  *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).  Congress enacted both provisions in the same statute.  Employee Retirement Income Security Act of 1974 ("ERISA of 1974"), Pub. L. No. 93-406, §§ 205(g)(3), 1021(a)(1), 88 Stat. 829, 863, 935.  And Congress amended both sections in lockstep.  *See* Retirement Equity Act of 1984 § 103(a), 98 Stat. at 1431 (codified at 29 U.S.C. § 1055(d)); *id.* § 203(b), 98 Stat. at 1442–43 (codified at 26 U.S.C. § 417(b)).

---

[22] The regulation states that "[actuarial e]quivalence may be determined, on the basis of consistently applied reasonable actuarial factors, for each participant or for all participants or reasonable groupings of participants."  26 C.F.R. § 1.401(a)-11(b)(2).  To be sure, the regulation uses the word "may."  But that word refers to the choice of whether to assess actuarial equivalence on a participant-by-participant or collective basis.  The subordinate clause, "on the basis of consistently applied reasonable actuarial factors," applies no matter which option a plan chooses.

34                    Opinion of the Court                    24-12773

We've previously suggested that parallel provisions across Title I of ERISA and the Internal Revenue Code have the same substantive meaning. *See Lyons v. Ga.-Pac. Corp. Salaried Emps. Ret. Plan*, 221 F.3d 1235, 1243 & n.13 (11th Cir. 2000). We noted that Congress added these counterpart sections to the Tax Code to encourage employers to create pension plans by "provid[ing] favorable tax treatment for plans which comply with ERISA's requirements," not to create new, differing substantive requirements. *Id.* at 1243 n.13 (quoting *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1144 n.6 (3rd Cir. 1993)). There's no reason to think Congress meant to create different meanings by using materially identical text in the same statute.

Defendants contend that we should disregard the tax regulation as "unenforceable" in this case. But to start, it's not clear that Defendants' unenforceability premise is correct.[23] And even if it is,

---

[23] Reorganization Plan No. 4 of 1978 transferred authority to issue regulations under many sections of ERISA, including Section 1055, from the Secretary of Labor to the Secretary of the Treasury. *See* Reorganization Plan No. 4 of 1978, §§ 101(a), 104, 43 Fed. Reg. 47713, 47713–14, 92 Stat. 3790, 3790–91.

The Secretary of the Treasury then at least purported to make 26 C.F.R. § 1.401(a)-11 "apply when the Secretary of Labor exercises authority under Title I of [ERISA]" and "apply to employee plans subject to Title I of ERISA." *See* 53 Fed. Reg. 31837, 31838–39 (Aug. 22, 1988).

Similarly, the Secretary of the Treasury asserted that his "interpretative jurisdiction over the ERISA provisions that are parallel to the Code provisions addressed in these regulations," makes regulations including 26 C.F.R. § 1.401(a)-11 "apply for purposes of section 205(c)(3) of ERISA, [29 U.S.C. § 1055(c)(3),]

24-12773                Opinion of the Court                35

the question is not whether the tax regulation is binding. After *Loper Bright*, agencies' reasonable interpretations of ambiguous statutes are generally no longer controlling, anyway. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

Agencies' interpretations instead continue to hold the "power to persuade" based on their "body of experience and informed judgment." *Id.* at 402 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Here, the Treasury Department's experience and judgment are particularly compelling for two reasons.

For one thing, the Secretary of the Treasury is authorized to name a majority of the voting members of the Joint Board for the Enrollment of Actuaries. That board is the body that Congress charged with establishing "reasonable standards and qualifications for persons performing actuarial services with respect to plans in which [ERISA] applies." 29 U.S.C. § 1242(a).

And affording respect to an executive branch interpretation is "especially warranted" when it "was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright*, 603 U.S. at 386. That's the situation here. The Secretary of the Treasury issued the regulation in 1977, 42 Fed. Reg. 1463, 1466 (Jan. 7, 1977), and it remains identical today, *see* 26 C.F.R. § 1.401(a)-11(b)(2).

---

as well as for section 417(a)(3) of the Code." 68 Fed. Reg. 70141, 70141–42 (Dec. 17, 2003). Defendants don't explain why Sections 1055(a) or 1055(d), which are also part of Section 205 of ERISA, would operate differently.

For both these reasons, the Secretary of the Treasury's longstanding view confirms the conclusion that actuarial equivalence requires reasonable actuarial assumptions.

Second, the plain meaning of the words in "actuarial equivalent" suggests reasonable, realistic actuarial assumptions. Of course, in the case of a conflict, "the ordinary meaning of a term will yield when the term has 'a technical meaning' or is a 'term of art.'" *United States v. Obando*, 891 F.3d 929, 934 (11th Cir. 2018) (brackets omitted) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)). But here, plain and technical meanings are in harmony.

Start with "equivalent." The edition of *Black's Law Dictionary* in place when Congress passed ERISA defines the word as "[e]qual in value, force, measure, volume, power, and effect or having equal or corresponding import, meaning or significance; alike, identical." Equivalent, *Black's Law Dictionary* (4th rev. ed. 1968). Odom alleges that, under realistic mortality expectations, his joint-and-survivor annuity will pay several thousand dollars less to him and his spouse than would the single-life annuity he earned. Those two annuities are not "equal in value" or "effect" in any meaningful sense. *Id.* Nor do they have equal "import" or "significance." *Id.*

Common definitions of terms related to "actuarial" practice show a connection to data and empiricism. "Actuarial tables" are "[a] form of organized statistical data which indicates the life expectancy of a person." Actuarial Table, *Black's Law Dictionary* (5th ed.

1979).[24]  And although the definition of "actuary" in older editions doesn't say much, more recent dictionaries show that the meaning of "actuary" dating back to the 18th century is a "statistician who determines the present effects of future contingent events; esp., one who calculates insurance and pension rates on the basis of empirically based tables."  Actuary, *Black's Law Dictionary* (12th ed. 2024) (emphasis added).[25]  Both definitions show that actuaries use real-world data to calculate life expectancy.

Third, and finally, the canon against insignificance favors Odom's reading.  Defendants' interpretation would rob the "actuarial equivalent" provision of nearly all its import.  If a plan could plug in sorely outdated or completely arbitrary actuarial assumptions, then it could produce joint-and-survivor annuities worth, as

---

[24] The 4th edition of *Black's Law Dictionary* does not define "actuarial table." But it defines "mortality tables" similarly: "A means of ascertaining the probable number of years any man or woman of a given age and of ordinary health will live."  Mortality Tables, *Black's Law Dictionary* (4th rev. ed. 1968).  The 5th edition clarifies that the two terms are largely synonymous.  *See* Actuarial Table, *Black's Law Dictionary* (5th ed. 1979).

[25] Although dictionaries published at the time a legislature enacted a statute are useful for discerning the meaning of statutory text, modern dictionaries can be probative as well.  *See, e.g.*, *Culbertson v. Berryhill*, 586 U.S. 53, 59 (2019) (considering dictionaries "[b]oth at the time of enactment and today").  It may be especially appropriate to look to more recent dictionaries when interpreting statutes, like ERISA, that Congress has re-enacted or re-authorized.  *See United States v. Webster*, 127 F.4th 318, 327 (11th Cir. 2025) (Jordan, J., concurring in the judgment) ("Such an approach recognizes the fluidity of language and promotes notice to the public while at the same time acknowledging Congress' institutional competence to update statutes first enacted long ago.").

Odom puts it, a "tiny fraction" of the participant's single-life annuity. That would make "actuarial equivalence" unequal in all but name.

Defendants seek to reassure us that, in practical terms, their reading would still constrain plan sponsors. They remind us that the Tax Code requires plan sponsors to write into the plan document the actuarial assumptions they will use. *See* 26 U.S.C. § 401(a)(25). And of course, another part of ERISA requires plan fiduciaries to adhere to the terms of a plan when a contrary command of ERISA does not counteract them. 29 U.S.C. § 1104(a)(1)(D). So Defendants suggest that plans won't use outlandish assumptions because they would be too embarrassed to write them into a plan document.

But Section 401(a)(25) wasn't added to the Tax Code until 10 years after Congress created the actuarial-equivalent requirement. Retirement Equity Act of 1984 § 301(b), 98 Stat. at 1451. Later-in-time legislation can't explain why Congress would write a meaningless provision years earlier.

We're not sold on Defendants' premise as a practical matter, either. Perhaps a plan would shy away from using 1789 mortality tables. But if the only restraint on plans is public perception, that restraint lacks power. Plans could simply use mortality assumptions that are just as unrealistic as the 1789 mortality tables but phrased in less obvious terms.

We disfavor constructions of a statute that leave a word insignificant, even if not utterly superfluous. *See Duncan v. Walker,*

533 U.S. 167, 174 (2001).  Interpreting "actuarial equivalent" to allow employers to calculate retirement benefits using any assumptions they please would leave the term insignificant, at most.  *See Reichert*, 170 F.4th at 484; *cf. Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'").

### 2. *Statutory Structure & Context*

Depriving "actuarial equivalent" of its force is problematic given the protective purpose that is apparent from the joint-and-survivor annuity provision's text and statutory context.

To explain why, we begin with the statutory context of Section 1055(d)'s actuarial equivalent requirement.  A "fundamental canon of statutory construction" provides that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Miller*, 604 U.S. 518, 533 (2025) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  We "account for both the specific context in which language is used and the broader context of the statute as a whole." *Gundy v. United States*, 588 U.S. 128, 141 (2019) (ellipsis omitted) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014)).

Two aspects of the "actuarial equivalent" requirement's statutory context support giving it real teeth: the overarching protective intent of Section 1055's measures to ensure economic security for spouses and the statute's legislated findings and purpose section.

a. Section 1055 contains interlocking
protections for spouses.

Section 1055 contains an interlocking set of protections for participants' spouses. These provisions show a shared, animating concern of ensuring that a spouse enjoys economic security after a participant dies.

To start, ERISA makes the joint-and-survivor annuity the default form of benefits for married plan participants. *See* 29 U.S.C. § 1055(a)(1). Joint-and-survivor annuities continue to pay a survivor annuity to spouses after the participant dies, which ERISA mandates is "not less than 50 percent" of the payments during the joint lives of the participant and spouse. *Id.* § 1055(d)(1)(A). This protection has been in ERISA from the very beginning. *See* ERISA of 1974 § 205(g)(3), 88 Stat. at 863. The statute's joint-and-survivor annuity provision would mean little if it guaranteed a spouse 50 percent of an amount that plans can greatly reduce by using unreasonable actuarial assumptions.

In the Retirement Equity Act of 1984, Congress added more protections for participants' spouses. *See* Retirement Equity Act of 1984 § 103(a) 98 Stat. at 1429–33 (amending 29 U.S.C. § 1055). It created qualified *preretirement* survivor annuities, ensuring that spouses would still be able to count on payments if the participant died before retirement age. *See* 29 U.S.C. § 1055(a)(2), (e). The value of payments under that preretirement death benefit must be at least equal to the "not less than 50 percent" standard for survivor

payments in qualified joint-and-survivor annuities. *See id.* § 1055(e)(1)(A).

Congress also imposed tough spousal notice and consent protections. Participants can waive the joint-and-survivor annuity or preretirement survivor annuity form of their benefits only with spousal consent. *Id.* § 1055(c)(2). And plans must inform spouses of their rights. *Id.* § 1055(c)(3)(A)–(B)(i).

As a whole, then, Congress created robust substantive and procedural protections for spouses. That clashes with the suggestion that Congress left plan sponsors free to use unreasonable or arbitrary actuarial assumptions that shortchange participants and their spouses. As then-Judge Kavanaugh put it, "ERISA's actuarial equivalence requirement serves to protect actual retirees"—and their spouses—"not merely to ensure that pension plans correctly perform abstract calculations." *Stephens*, 644 F.3d at 443 (Kavanaugh, J., concurring).

To be sure, Congress added some of these protections a decade after it first enacted the "actuarial equivalent" requirement. But when the efficacy of later legislation is premised on a particular, plausible interpretation of an earlier statute, that reading is entitled to "great weight." *Loving v. United States*, 517 U.S. 748, 770 (1996) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980)). That's the case here. The later enactments would have little effect if ERISA's "actuarial equivalent" requirement imposed no substantive limits on the assumptions a plan uses. (And as we've said, Congress added more instances of the

term "actuarial equivalence" to Section 1055 in the same 1984 legislation adding the new spousal protections.)

We are not the only court to recognize Section 1055's protective intent.  The Supreme Court observed that the "statutory object of the qualified joint and survivor annuity provisions, along with the rest of § 1055, is to ensure a stream of income to surviving spouses," in keeping with "ERISA's solicitude for the economic security of surviving spouses." *Boggs*, 520 U.S. at 843.  The Court reasoned that "[i]t would undermine the purpose of ERISA's mandated survivor's annuity" if state testamentary transfer laws allowed a prior, predeceased spouse "to defeat in part [the surviving spouse's] entitlement to the annuity § 1055 guarantees her as the surviving spouse" and that "[n]othing in the language of ERISA supports concluding that Congress made such an inexplicable decision." *Id.* at 844.  Shortly before the Court issued *Boggs*, we similarly acknowledged the "legislative policy of protecting spousal rights" inherent in Section 1055.  *Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863, 867 (11th Cir. 1997).

The same logic applies here.  Because of the strict spousal consent requirements, "[e]ven a plan *participant* cannot defeat a nonparticipant surviving spouse's statutory entitlement to an annuity." *Boggs*, 520 U.S. at 843 (emphasis added).  Yet Defendants propose that Congress allowed a *plan* to undermine a spouse's entitlement by using unreasonable actuarial assumptions to shrink the monthly survivor annuity payment.  That idea is just as

inexplicable—and equally unmoored from ERISA's text—as was the proposal in *Boggs*.

    b.  <u>ERISA displays an overarching purpose of ensuring participants receive their earned benefits.</u>

Other sections of ERISA show that Congress intently focused on ensuring workers will receive the benefits they earn.

Take the statute's legislated findings and declaration of policy. Congress found that "many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions" or to inadequate plan funding. 29 U.S.C. § 1001(a). In response, Congress declared the policy of ERISA "to protect . . . the interests of participants in private pension plans and their beneficiaries" by, among other things, "improving the equitable character and the soundness of such plans," "requiring them to vest the accrued benefits of employees with significant periods of service," establishing fiduciary duties for plans, and "providing for appropriate remedies, sanctions, and ready access to the Federal courts." *Id.* § 1001(b)–(c).

Congress doubled down on this understanding later. When it amended ERISA in 1986, the legislature found that "the continued well-being and retirement income security of millions of workers, retirees, and their dependents are directly affected" by "single-employer defined benefit pension plans" like the one in this case. *See id.* § 1001b(a)(1)–(2). So Congress added a declaration of the statute's policy of "increas[ing] the likelihood that participants and

beneficiaries under single-employer defined benefit pension plans will receive their *full* benefits." *Id.* § 1001b(c)(3) (emphasis added).

In short, the legislated findings and declaration of policy speak to *benefits* for participants and beneficiaries and *obligations* for plans. These provisions survived the "step-by-step, deliberate and deliberative process" of bicameralism and presentment that the Constitution's framers imposed. *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 959 (1983). They can be a particularly helpful guide to selecting between permissible readings of a statutory phrase. *See Georgia v. President of the U.S.*, 46 F.4th 1283, 1300 (11th Cir. 2022) (opinion of Grant, J.).

Similarly, ERISA embodies the goal of securing workers' retirement benefits through its "nonforfeitability" rules. We'll discuss Section 1053 later in more detail. But it makes "an employee's right to his normal retirement benefit . . . nonforfeitable upon the attainment of normal retirement age" and makes his right to his accrued benefit nonforfeitable earlier than that. 29 U.S.C. § 1053(a). So it would be odd to read Section 1055 as opening a loophole to defeat the broader purpose of ensuring workers receive what they earn.

The statutory context of ERISA's "actuarial equivalent" requirement gives color and meaning to the term. And while we don't rely on the legislative history of ERISA and its amendments in construing the statute, it's worth noting that our reading of the statute is consistent with that legislative history as well.

Congressional conference and committee reports[26] show a consistent understanding across decades:  Actuarial equivalence involves reasonable actuarial assumptions.  ERISA's 1974 Conference Committee Report noted that the statute permitted plans to make "reasonable actuarial adjustments" so that providing joint-and-survivor annuities would not increase the "total costs of the plan" above the single-life annuity option, due to adverse selection.  S. Rep. No. 93-1090, at 280 (1974) (Conference Report).

And Congress clarified even further when it expanded the joint-and-survivor annuity requirement in 1984.  The Senate Committee Report stated that joint-and-survivor annuities must be the "actuarial equivalent" of the normal form of life annuity, explaining that "[e]quivalence may be determined on the basis of consistently applied reasonable actuarial factors."  S. Rep. No. 98-575, at 13 (1984).

Finally, Congress reiterated this view in 1994 when it revised Section 1055 to require specified mortality tables for calculating a lump-sum payout of a participant's annuity.  Retirement Protection Act of 1994, Pub. L. No. 103-465, § 767(c)(2), 108 Stat. 4809, 5039 (adding 29 U.S.C. § 1055(g)(3)).  The House Committee Report first reviewed the existing law, which didn't limit mortality assumptions

---

[26] "[T]he Committee Reports on the bill . . . represent the considered and collective understanding of those Members of Congress involved in drafting and studying proposed legislation."  *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1205–06 (11th Cir. 2007) (cleaned up) (quoting *Garcia v. United States*, 469 U.S. 70, 76 (1984)).

beyond the "actuarial equivalent" requirement. *See* 29 U.S.C. § 1055(g) (1988). That requirement, the Report explained, meant that "[a] plan may use any *reasonable* mortality table it specifies." H.R. Rep. No. 103-632, pt. 2, at 57 (1994) (emphasis added).

In sum, the congressional committee reports from when Congress enacted and amended Section 1055 are consistent with our conclusion that "actuarial equivalent" requires reasonable actuarial assumptions. *Cf. Mamani v. Sanchez Bustamante*, 968 F.3d 1216, 1233 n.14 (11th Cir. 2020) ("The legislative history also confirms what a comparison of the text would suggest.").

### 3. Defendants' Counterarguments

Defendants and their amici advance two sets of arguments in favor of requiring only mathematical equivalence with no conditions on the assumptions a plan uses. Neither persuades us.

#### a. The *Russello* presumption is inapplicable.

Principally, Defendants rely on *Russello v. United States*, 464 U.S. 16 (1983). *Russello* states that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* at 23 (citation omitted).

*Defendants' Cited Provisions*—Defendants point out four ERISA provisions that expressly mandate "reasonable" (or specified) actuarial assumptions a plan can use in other circumstances. Defendants assert that we must presume that Congress acted

intentionally in omitting "reasonable" from Section 1055(d). So, they say, we should interpret "actuarial equivalent" to allow calculations using any set of actuarial assumptions. But as we explain, the *Russello* presumption is inapplicable here.

One of Defendants' provisions requires plans to use specific mortality and interest-rate assumptions that the Secretary of the Treasury prescribes. *See* 29 U.S.C. § 1055(g)(3). It applies when plans make an immediate, single lump-sum payment of "the present value" of a joint-and-survivor or preretirement-survivor annuity in lieu of monthly payments. Plans may choose to make a single payment if the participant and spouse consent or if the annuity's present value is $7,000 or less. *Id.* § 1055(g)(2).

Three other categories of funding-related provisions expressly mandate the use of "reasonable" actuarial assumptions for present-value calculations.

Minimum funding provisions set a "funding target" based on the present value of benefits accrued under the plan. *Id.* § 1083(a), (d)(1). Plans must determine those present values based on "actuarial assumptions and methods . . . each of which is reasonable" and which, combined, "offer the actuary's best estimate of anticipated experience under the plan." *Id.* § 1083(h)(1).

Funding improvement provisions require significantly underfunded multiemployer plans to take steps to catch up on funding. *Id.* § 1085(a)(1)–(2). To determine whether a plan is underfunded, an actuary must project the present value of all liabilities to participants and beneficiaries, using "reasonable actuarial

estimates, assumptions, and methods," compared to the plan's assets. *Id.* § 1085(b)(3)(B)(i).  A funding improvement plan under this section also must rest on "reasonably anticipated experience and reasonable actuarial assumptions."  *Id.* § 1085(c)(3)(A), (e)(3)(A).

And withdrawal liability rules require employers that leave a multiemployer plan to pay their share of "unfunded vested benefits" owed to participants and beneficiaries.  *Id.* § 1381(a)–(b)(1). Again, the actuary must calculate withdrawal liability by using "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan."  *Id.* § 1393(a)(1).

Defendants assert that these provisions show Congress "knew how" to explicitly require particular actuarial assumptions. So Defendants argue that Congress's use of an actuarial-equivalence standard "unadorned" by the word "reasonable" is unlikely to be an oversight.

We disagree.

*Later-Enacted Statutes*—Defendants' argument has a big hole. All four provisions they cite came years *after* Congress created the actuarial-equivalence rule.  Congress imposed Section 1055(g)'s mandate of specific mortality assumptions twenty years after creating the actuarial-equivalence requirement; and the three funding-

related provisions that require "reasonable" assumptions came between six and thirty-two years after.[27]

These later-enacted statutes say nothing about what a different Congress intended or "knew how" to do years earlier.[28] Nor does our precedent suggest otherwise. Defendants cite cases in which we used language from an *earlier*-enacted section of the statute to interpret language that was enacted *later*—the opposite of what they ask us to do here. *See Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1284 n.5 (11th Cir. 2011) (interpreting language enacted seven years after its comparator); *United States v. Elliott*, 62 F.3d 1304, 1311–12 (11th Cir. 1995) (twenty years).

We have noted that *Russello* itself cautions that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Lyons*, 221 F.3d at 1246–47 (quoting *Russello*, 464 U.S. at 26). We made this point while discussing the very provision that Defendants rely on now. *See id.* (addressing 29 U.S.C.

---

[27] Congress enacted withdrawal-liability rules in 1980. Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364, § 104(2), 94 Stat. 1208, 1233 (adding 29 U.S.C. § 1393(a)(1)). Later, Congress specified mortality tables for lump-sum distributions of retirement benefits in 1994. *See* Retirement Protection Act of 1994 § 767(c)(2), 108 Stat. at 5039 (adding 29 U.S.C. § 1055(g)(3)). Finally, Congress added minimum-funding and funding-improvement rules in 2006. Pension Protection Act of 2006, Pub. L. No. 109-280, § 102(a), 120 Stat. 780, 797 (adding 29 U.S.C. § 1083(h)(1)); *id.* § 202(a), 120 Stat. at 870, 872, 877 (adding 29 U.S.C. § 1085(b)(3)(B)(i), (c)(3)(A), (e)(3)(A)).

[28] Of course, as we explained, it's different when a later amendment depends for its effectiveness on a particular meaning of an ambiguous phrase in a statute. But none of the provisions that Defendants meet this condition.

50                    Opinion of the Court                24-12773

§ 1055(g)).  We "give effect to the statutory language," as enacted; "we do not change our interpretation based on negative inferences that may be drawn from a subsequent amendment to ERISA."  *Bd. of Trs. of the W. States Off. & Pro. Emps. Pension Fund v. Welfare & Pension Admin. Serv., Inc.*, 24 F.4th 1278, 1286 (9th Cir. 2022).

Defendants respond that the 1974 Act included a reasonableness provision that resembles the one in today's Section 1083.  And that provision applied to the actuarial assumptions used throughout the part of ERISA dealing with funding requirements:

> For purposes of this part [Title I, Subtitle B, Part 3], all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

ERISA of 1974 § 302(c)(3), 88 Stat. at 871.

This earlier provision brings Defendants closer to the mark. It would have been at least conceivable for the Congress of 1974 to write that, "for purposes of this *title*, all *calculations*" must use reasonable actuarial assumptions.

*Three Additional Flaws*—But even assuming this older provision saves Defendants' *Russello* argument from irrelevance, it remains uncompelling for at least three reasons.

24-12773               Opinion of the Court                    51

First, the provisions Defendants cite are different from Section 1055(d) both linguistically and conceptually. In terms of language, each of Defendants' cited provisions refers to a calculation of "present value."[29] None uses the term "actuarial equivalent." In contrast, Section 1055(d) and its counterpart, Section 1054(c)(3), both use the term "actuarial equivalent" but don't discuss "present value" or "actuarial assumptions." *See* 29 U.S.C. §§ 1054(c)(3), 1055(d). This dissimilarity weakens any inference we might draw from these other parts of ERISA. *See Gomez-Perez v. Potter*, 553 U.S. 474, 485, 487 (2008).

These provisions also address different concepts. As Defendants emphasize, "each and every one of the statutes cited by the district court and by Defendants [as mandating specified or reasonable actuarial assumptions] involves the reduction of future benefit payment liabilities to a present value." But Section 1055(d) necessarily compares the value of two future streams of payments.[30] And a reduction to present value is only one part of that process. Similarly, except for the twenty-years-too-late Section

---

[29] The original reasonableness requirement, in Section 302(c)(3) of ERISA, did not itself contain the term "present value." Still, it applied to numerous calculations of liability including at least one explicit measurement of "the present value of accrued benefits." ERISA of 1974 § 305(b)(1)(B), 88 Stat. at 874. The Part to which it applies includes no uses of the term "actuarial equivalent." *Id.* §§ 301–306, 88 Stat. at 868–74.

[30] Section 1054(c)(3)'s actuarial-equivalence requirement, which applies when an "employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age," also governs comparisons between two future streams of payments. 29 U.S.C. § 1054(c)(3).

Case 2:22-cv-00174-SCJ    Document 69    Filed 05/26/26    Page 52 of 69
USCA11 Case: 24-12773    Document: 77-1    Date Filed: 05/26/2026    Page: 52 of 67

52                    Opinion of the Court                    24-12773

1055(g), all the sections Defendants cite pertain to funding requirements. But Sections 1055(d) and 1054(c)(3) are vesting requirements. All these differences cause the *Russello* presumption to lose its force. *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435–36 (2002) ("The *Russello* presumption . . . grows weaker with each difference in the formulation of the provisions under inspection.").

Second, the fact that actuarial equivalence encompasses two present-value calculations hurts Defendants' case in another way. As originally enacted, ERISA consistently described reductions to present value as requiring "reasonable" assumptions. In fact, *every* reference to actuarial assumptions in the 1974 Act—except for two assumptions to be determined by a public body—includes some form of reasonableness requirement.[31]

Actuarial equivalence is a higher-order concept that includes present-value calculations. And a reference to the whole necessarily refers to its component parts as well. *Cf. Sea-Land Serv., Inc. v. R.V. D'Alfonso Co.*, 727 F.2d 1, 2 (1st Cir. 1984) ("If one states the

---

[31] *See* ERISA of 1974 §§ 103(a)(4)(B), 103(d)(8)(B), 302(b)(2)(B)(v), 302(b)(3)(B)(iii), 302(c)(2)–(3), 1013(a), 1013(c), 1013(d)(1)(B)–(C), 1033(a), 88 Stat. at 843, 846, 870, 871, 914–15, 916, 921–23, and 948; *cf. id.* §§ 4008, 4046, 88 Stat. at 1014, 1028 (referring to assumptions of the Pension Benefit Guaranty Corporation). One funding provision, and its Tax Code analogue, did not include an explicit reasonableness requirement, *id.* §§ 302(b)(2)(B)(v), 302(b)(3)(B)(iii), 1013(a), 88 Stat. at 870, 914–15—but falls within Part 3 of Title I of ERISA, all of which had to use reasonable assumptions, *id.* § 302(c)(2)–(3), 88 Stat. at 871.

general, there should be no need to specify the particular; the whole includes all of its parts."). So ERISA's consistent expectation to use reasonable actuarial assumptions when calculating present values implies that a broader process that includes present-value calculations will employ the same type of assumptions.

Defendants' contrary theory suggests that Congress must rearticulate every step of a process—and every condition and qualification for each step—every time it wishes to reference a process as a whole. But that is not the law. Indeed, that kind of drafting would lead to absurdity.

Third, Defendants don't respond to the way that the *Russello* presumption cuts in Odom's direction. In other sections of ERISA, Congress explicitly referred to retirement benefits as "determined under the plan," 29 U.S.C. §§ 1002(23)(A), 1054(b)(1)(D)(i), or due "under the terms of the plan," *id.* § 1132(a)(1)(B). But Section 1055(d) lacks similar language. It doesn't state that we should consider whether two benefits are actuarially equivalent "under the terms of the plan." So if Defendants' view of *Russello* were correct, we would need to presume that Congress purposely omitted that language from Section 1055(d). The upshot would be clear: Congress didn't want us to base the meaning of "actuarial equivalent" on whatever assumptions a plan wrote into its terms. Defendants do not explain why we should conclude that *Russello* supports their

54                     Opinion of the Court                    24-12773

reading but not Odom's.  We are reluctant to accept reasoning that boils down to "presumption for me, but not for thee."[32]

For all these reasons, Defendants' attempt to rely on the *Russello* presumption falls flat.

b.  Contrary purposive and policy arguments are unpersuasive.

Defendants and their amici also make several appeals to purpose- and policy-based arguments.  They argue that a reasonableness requirement would conflict with ERISA's "background principles," that it would impose unmanageable costs on plans, and that it's better to leave actuarial assumptions up to negotiations in the labor market.  We disagree.  But even if we agreed, we must construe the statute Congress wrote.  So if Defendants have concerns about that statute, they must take them to Congress.

*Background Principles*—Defendants highlight predictability, flexibility, and deference to employer discretion as key themes of the statute.  These principles, Defendants argue, help "induc[e] employers to offer benefits" in the first place "by assuring a predictable set of liabilities, under uniform standards of primary conduct." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (quoting *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002)).  In Defendants' view, Odom's reading of "actuarial equivalence" would disrupt

---

[32] Unlike the sections that Defendants cite as using the term "reasonable," Congress used "under the plan" in the same statute that created the actuarial-equivalent requirement.  *See* ERISA of 1974 §§ 3(23)(A), 204(b)(1)(D)(i), 502(a)(1)(B), 88 Stat. at 836, 859, 891.

Congress's "careful balancing" of the interests of employees and employers.  *Id.* (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004)).

It's true that ERISA is a "comprehensive and reticulated statute." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)).  But Defendants don't show that judicial precedent, other signs of congressional intent, or practical considerations support their interpretation of the statutory text.

First, we have repeated the Supreme Court's sense of the "overall intent" of the statute: "'ERISA is a comprehensive statute *designed to promote the interests of employees and their beneficiaries* in employee benefit plans.'" *Morstein v. Nat'l Ins. Servs., Inc.*, 93 F.3d 715, 718 (11th Cir. 1996) (emphasis added) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)).  To be sure, Congress also attempted to encourage employers to offer benefits in the first instance, including by seeking to ensure predictable liabilities. *Conkright*, 559 U.S. at 517.  But we must view this aim in light of Congress's overarching ambition to "ensure that employees would receive the benefits they had earned." *Id.* at 516.  We don't see how it serves this goal to let plans transform annuities into a form that is worth far less than the benefit a worker earned.

Second, amici exaggerate the degree of deference ERISA affords to plans' written terms.  As an amicus, the Chamber of Commerce of the United States of America writes that Congress made pension plans' written terms "sacrosanct."  But the statute requires

fiduciaries to adhere to a plan's written terms only "so long as they do not conflict with ERISA['s]" substantive requirements. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424 (2014); *see* 29 U.S.C. § 1104(a)(1)(D). So amici just restate the question in this case. Later stages in this litigation will determine whether the Plan's written terms do, in fact, conflict with a substantive requirement in ERISA.

Defendants cite a 1972 Senate Committee Report as showing that Congress viewed "[f]lexibility of plan structure" as "essential" so that employers can "mold the plans to [the] individual and collective needs of different workers, industries, and locations." S. Rep. No. 92-634, at 21 (1972). But using reasonable actuarial assumptions doesn't necessarily make plan structure inflexible.

Third, Defendants and one set of amici suggest that pressure in the labor market makes a statutory reasonableness requirement unnecessary. "Free market forces" and a fear of embarrassment would, they assure us, make sure that plans use reasonable actuarial assumptions without the need for litigation. But as we've explained, even if that's so (and we don't know that it is), Congress did not adopt that perspective. "ERISA was enacted to *restrict* employers' and employees' freedom of contract when bargaining over pensions." *Esden*, 229 F.3d at 172 (emphasis added).

*Cost Concerns*—Defendants and amici representing large employers also raise cost concerns. They contend that requiring "reasonable" actuarial assumptions would force employers to "constantly" re-evaluate and update their actuarial assumptions.

24-12773                Opinion of the Court                57

One amicus states that plan administrators would have to make individualized, case-by-case adjustments to pension payouts. Beyond being expensive to administer, the amici fear the standard would open a costly "floodgate of litigation" and produce oppressive settlements. They argue participants and beneficiaries would be the real losers because employers would simply cut back the benefits they offer.

We understand these concerns. But to reiterate, "actuarial equivalence" permits plans to use any of a range of reasonable mortality and interest-rate assumptions. *See Bakery & Confectionary Union*, 888 F.3d at 706. Odom advocates for exactly this sort of flexibility within limits. And professional publications support it as well. *See ASOP No. 1* § 2.10 ("[T]here will often be a range of reasonable methods and assumptions[.]"). In any event, the employers' concerns cannot alter the meaning of the statute before us. The text and statutory context of the "actuarial equivalence" requirement compel our interpretation.

★ ★ ★

For these reasons, we conclude that Section 1055(d)'s "actuarial equivalence" rule requires plans to use actuarial assumptions that are reasonable at the time the plan calculates a participant's retirement benefit. Because Odom alleges that the Plan fell short

of this standard when it calculated his joint-and-survivor annuity payment,[33] we reverse the district court's dismissal of Count I.

### B. *Joint-and-Survivor Annuity Conversion as Forfeiture*

In his second claim, Odom alleges that Defendants' conversion of his single-life annuity to a joint-and-survivor annuity also violates ERISA's "nonforfeiture" rule. That provision requires pension plans to "provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Odom argues that his single-life annuity is his "normal retirement benefit" and its conversion to a less valuable joint-and-survivor annuity is a prohibited forfeiture.

Defendants urge us to affirm dismissal of this claim for two reasons. First, they argue that Odom's anti-forfeiture and "actuarial equivalence" claims rise or fall together under the principle of statutory interpretation that "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). But we've already established that Defendants' calculation of Odom's joint-and-survivor annuity violates the more specific provision. So this argument doesn't help Defendants.

Second, Defendants argue that *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981), forecloses this forfeiture claim. *Alessi* held that "the statutory definition of 'nonforfeitable' assures that an

---

[33] Defendants do not challenge the factual sufficiency of Odom's Count I allegations under the plausibility pleading standard.

24-12773               Opinion of the Court                    59

employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit." *Id.* at 512. Defendants propose that the decision's "reasoning should apply with equal force to permit a plan sponsor to set the method used to convert that benefit to other forms of payment." But this suggested broadening of *Alessi* finds no support in the decision and runs contrary to ERISA's text.

To explain why, we focus on the two central concepts in Section 1053(a): the "normal retirement benefit" and what it means for that benefit to be "nonforfeitable."

### 1. *"Normal Retirement Benefit"*

We treat Odom's "normal retirement benefit" as a single-life annuity. ERISA defines the term as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." 29 U.S.C. § 1002(22). And the 2018 Plan defines a participant's "Normal Retirement Income" as his "monthly Retirement Income" payable "as a single life annuity." Defendants don't contest the point.[34]

---

[34] Because it is undisputed, we assume without deciding that Odom's Normal Retirement Income under the 2018 Plan is his "normal retirement benefit" for purposes of 29 U.S.C. §§ 1002(22) and 1053(a). We express no view about what relationship, if any, the default form of a participant's retirement benefit has to his or her "normal retirement benefit." *Cf.* 29 U.S.C. § 1055(a)(1), (c), (f) (making joint-and-survivor annuities the default form of retirement benefit for married participants).

This fact destroys Defendants' *Alessi*-based argument. They cite *Alessi*'s statement that the definition of "nonforfeitable" doesn't "guarantee a particular amount or a method for calculating" the protected benefit. 451 U.S. at 512. But the protected benefit is a participant's normal retirement benefit. And Odom's issue is what happens *after* the plan calculates his normal retirement benefit.

### 2. Forfeiture

Odom has plausibly alleged forfeiture of his normal retirement benefit, too. He directs us to the Seventh Circuit's decision in *Contilli v. Local 705 International Brotherhood of Teamsters Pension Fund*, 559 F.3d 720 (7th Cir. 2009), for his definition of "forfeiture." The court in *Contilli* concluded that "a reduction in the total value of all monthly benefits is a kind of forfeiture." *Id.* at 722. For that reason, it held that receiving an annuity with a lower value than the normal retirement benefit violates Section 1053(a).

Odom also points us to a Treasury regulation, 26 C.F.R. § 1.411(a)-4(a). It states, "Certain adjustments to plan benefits such as adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." *Id.* ERISA causes this regulation to apply equally to Section 1053(a). *See* 29 U.S.C. § 1202(c); *cf.* 26 U.S.C. § 411(a) (paralleling 29 U.S.C. § 1053(a)).

Both *Contilli* and the Treasury regulation align with our reading of ERISA's definition of "nonforfeitable." The statute defines the term as an "unconditional" and "legally enforceable" claim to "that part of an immediate or deferred benefit under a pension plan which arises from the participant's service." 29 U.S.C.

§ 1002(19). We can apply this definition to Section 1053(a): Upon reaching normal retirement age, a participant gains an unconditional, legally enforceable claim to his normal retirement benefit.

As Defendants explain, the more specific "actuarial equivalent" provisions of ERISA color our reading of this requirement. The statute treats two forms of a benefit as interchangeable only if they hold the same value. And Odom alleges that the plan is giving him a benefit less valuable than his "normal retirement benefit." We conclude that this reduction in value compromises his unconditional claim to the value of his normal retirement benefit.

### C. QPSA Charge as Forfeiture

Both Plaintiffs have also plausibly alleged that their QPSA charges violated Section 1053(a)'s nonforfeiture rule. Our analysis proceeds in two parts. First, we construe the scope of Section 1055(i), the relevant exception that Congress created in the nonforfeiture rule. Second, we consider whether Plaintiffs' factual allegations would, if proven, establish that the Plan's QPSA charges exceed the maximum amount that Section 1055(i) permits.

#### 1. Permissible QPSA Charges

We start with ERISA's allowance for deductions from a participant's accrued benefit to account for providing a preretirement survivor annuity. Two parts of ERISA interact to limit the QPSA charges a plan may impose: Section 1053(a)'s nonforfeiture rule and Section 1055(i)'s exception to that rule.

62                    Opinion of the Court                    24-12773

Congress added a new cost for plans in 1984 when it required them to give preretirement survivor annuities to married, vested participants. *See* 29 U.S.C. § 1055(a)(2). This change added another category of people plans must pay: spouses of participants who die before retiring.

But Section 1053(a)'s nonforfeiture rule posed a barrier to compensating for the new cost. As we discussed, that subsection protects a participant's normal retirement benefit upon reaching retirement age. It also protects a participant's accrued benefit before retirement. *See id.* § 1053(a)(1)–(2).[35] Deducting QPSA charges from a participant's accrued benefit would violate Section 1053(a) on its face. For example, Drummond and Odom say that their QPSA charges reduced their total pension benefit by 13.1 and 10.4 percent, respectively.

So Congress created, in effect, an exception to the general nonforfeiture rule. The 1984 amendments added Section 1055(i): "A plan may take into account in any equitable manner (as determined by the Secretary of the Treasury) any increased costs resulting from providing . . . a qualified preretirement survivor annuity." *Id.* § 1055(i).

---

[35] An employee's "rights in his accrued benefit derived from his own contributions" are always nonforfeitable. 29 U.S.C. § 1053(a)(1). He gains a nonforfeitable right to 100 percent of his accrued benefit derived from employer contributions over the course of five to seven years. *See id.* § 1053(a)(2).

Three aspects of Section 1055(i) support the conclusion that a plan may not impose a QPSA charge larger than one based on reasonable, realistic actuarial assumptions.

First, the statute "expressly delegate[s]" to the Secretary of the Treasury determination of what type of QPSA charges count as equitable. *Loper Bright*, 603 U.S. at 394–95 (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)). The applicable regulation provides that "[a] charge for the QPSA that *reasonably* reflects the cost of providing the QPSA will not fail to satisfy [26 U.S.C. § 411] even if it reduces the accrued benefit." 26 C.F.R. § 1.401(a)-20, Q&A 21 (emphasis added).[36] We must recognize and give effect to statutory delegations. *Loper Bright*, 603 U.S. at 395. So we view this regulation as articulating the bounds of the "equitable manner[s]" plans may use to determine QPSA charges to deduct from a participant's otherwise nonforfeitable accrued benefit. 29 U.S.C. § 1055(i).

Of course, we must still ensure that the agency's interpretation fits within "the boundaries of the delegated authority." *Loper Bright*, 603 U.S. at 395 (brackets omitted) (quoting H. Monaghan, Marbury *and the Administrative State*, 83 Colum. L. Rev. 1, 27 (1983)). That takes us to the other aspects of Section 1055(i).

The second facet of Section 1055(i) that we find significant is its reference to a plan's "increased costs" from providing the

---

[36] Although 26 C.F.R. § 1.401(a)-20 addresses the corresponding part of the Tax Code, the Secretary of the Treasury expressly extended it to apply to Title I of ERISA, which includes 29 U.S.C. § 1055(i). *See* 53 Fed. Reg. 31837, 31838–39, 31846–47 (Aug. 22, 1988).

preretirement survivor annuity benefit.  29 U.S.C. § 1055(i).  This point of comparison implies a connection to an *actual* increase in costs—not arbitrary assumptions.  Of course, any prediction about the future involves uncertainty.  But reasonable actuarial assumptions provide the best guide to making that determination.

Third, the statute permits plans to use only an "equitable manner" to take increased costs into account.  "Equitable" connotes some degree of fairness. *See* Equitable, *Black's Law Dictionary* (5th ed. 1979) ("Just; conformable to the principles of justice and right.").  So this term suggests that plans' QPSA charges must be fair to participants.  Excessive, unrealistic reductions to participants' promised benefits are not.

All three aspects of Section 1055(i) point the same way.  QPSA charges reflect the "increased costs resulting from providing . . . a qualified preretirement survivor annuity" in an "equitable manner" if they rely on reasonable, realistic actuarial assumptions.

Defendants resist this reading.  They argue that the statute does not prescribe "the method" or "a particular set of actuarial assumptions" for calculating QPSA charges.  This omission, they suggest, gives them carte blanche.  But failing to prescribe a single, specific method for calculating QPSA charges is not the same as imposing no limitations whatsoever.

Here, once again, ERISA allows flexibility within limits.  The statute and the regulation it directs us to follow show that plans may not impose QPSA charges that exceed a reasonable reflection of the increased costs of offering preretirement survivor annuities.

### 2. Sufficiency of Plaintiffs' Allegations

Now, we turn to the factual sufficiency of Plaintiffs' allegations under this interpretation.

Plaintiffs allege that their "normal retirement benefits" take the form of a "single life annuity unreduced by the QPSA charge."[37] ERISA defines participants' protected "accrued benefit" in terms of "an annual benefit commencing at normal retirement age," too. 29 U.S.C. § 1002(23)(A). So the "unreduced" single-life annuity is the benefit that ERISA protects against forfeiture. Then the question is whether the QPSA charges Defendants deducted from that protected benefit exceed the amount Section 1055(i) allows.

With that baseline in mind, we can examine Plaintiffs' allegations. Plaintiffs sufficiently allege the maximum deductions that Section 1055(i) allows and then show that their QPSA charges exceed those values.

First, Plaintiffs allege that QPSA charges based on "appropriate and updated actuarial assumptions" would be "no more than"

---

[37] The Plan documents cast some uncertainty on this proposition. Plaintiffs assert that the Plan documents define the vested benefit in Section 4.2. But Section 4.2(a) of both the 2016 Plan and 2018 Plan documents expressly discusses a reduction for a "Death Benefit Charge" that seems to be the QPSA charge. And it isn't clear that the other subsection, Section 4.2(b), is relevant— it appears to apply to employees hired after January 1, 2016, or who became participants after January 1, 2017.

It could be fatal to Plaintiffs' claim if their vested benefit that is protected against forfeiture already reflects QPSA reductions. But Defendants do not make this argument, so we will not rely on it.

specific values—around 0.3 percent per year for Drummond and 0.6 percent per year for Odom. Those allegations establish the upper limit of charges that reasonably reflect the increased costs of offering the benefit.

Then, Plaintiffs identify their actual QPSA charges, which exceed those maximum reasonable fees. For Drummond, his annual 0.875-percent QPSA charge is 192 percent higher. Odom's is 0.75 percent per year, 25 percent above the alleged maximum.[38]

Finally, Plaintiffs round out their claim by alleging that these QPSA charges reduced their accrued benefits by more than the amount reasonable actuarial assumptions could support.

Together, these allegations are enough to state a prima facie claim that Plaintiffs' QPSA charges are unlawful forfeitures of their accrued benefits.

Defendants counter that Plaintiffs did not address all the costs that a plan incurs from offering a QPSA benefit. The only cost that Defendants identify as missing is the risk of adverse selection. That is the phenomenon that individuals with greater health risks are more likely to opt for services such as life or health

---

[38] We don't suggest that it will always be necessary to allege a specific ceiling to the range of reasonable QPSA charges. Indeed, it may be rare that plaintiffs could substantiate a precise cutoff. As we noted, reasonableness is a zone. Reasonable actuaries may reach differing answers to the same question. So it may be enough to allege that one's actual QPSA charges exceeded a particular, reasonable QPSA charge by a substantial margin. We express no view on how large that margin would need to be. The allegations here are enough.

insurance.  By increasing the average health-risk profile of participating individuals, adverse selection could increase the per-person cost to provide the preretirement survivor benefit.  *See King v. Burwell*, 576 U.S. 473, 480 (2015) (explaining adverse selection in health-insurance markets).

But adverse selection here is an issue of mortality risk.  Defendants suggest that participants with greater mortality risk would be likelier to retain the preretirement survivor annuity benefit.  Healthier participants, on the other hand, may be likely to opt out.

So Defendants' speculation goes to the reasonableness of the mortality assumptions the Plan used to estimate the chance it will need to pay out a given preretirement survivor annuity.  And Plaintiffs alleged that the Plan used "outdated, unreasonable, and inappropriate mortality assumptions" to calculate its QPSA charges.

Of course, Defendants will have the opportunity to present evidence of their own at later stages of this litigation.  Perhaps they will be able to establish that the Plan's mortality assumptions were appropriate considering adverse selection.  But either way, that isn't an issue to resolve on a motion to dismiss.

## IV.    CONCLUSION

For the reasons we've discussed, we reverse the district court's dismissal of all four of Plaintiffs' claims.  We remand the case for further proceedings.

**REVERSED and REMANDED.**

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 26, 2026

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  24-12773-GG
Case Style:  William Drummond, et al v. Southern Company Services, Inc., et al
District Court Docket No:  2:22-cv-00174-SCJ

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion